ATHENA COSMETICS Mr. Zaleson, when you're ready. Thank you, Your Honor, and may it please the Court, Stephen Zaleson for Athena Cosmetics. As the Court is aware, we contend that the District Court committed three distinct errors, any one of which requires reversal of the decision below. So I'm going to focus, with the Court's permission, on the first issue we brief, which is preemption. Obviously if the Court agrees with us on preemption, there's no need to reach the other issues. Allergan's claim in this case is preempted because, in the words of the United States Supreme Court, it exists solely by virtue of the requirements of the Food, Drug and And the Ninth Circuit, whose law controls here, has recently reaffirmed this year in the Perez case that if a state law claim alleges or attacks conduct because the conduct allegedly violates the FDCA, it's preempted. Now, in Buckman, the Supreme Court recognized that some state law claims that impose duties that parallel obligations or requirements of the FDCA are preempted, while others are not, and it set out the test for which side of the line the claims fall upon. If the state law claim is predicated on a duty that is a traditional state law obligation, which predated the FDCA, then the claim can proceed even though... Counsel, isn't Buckman a case about medical devices? 21 U.S.C. 360 K.A. or something like that, right? Medical devices. And as I read that statutory provision, it expressly articulates, doesn't it, a preemption clause in it? There is an express preemption clause for medical devices. So Congress has come along and expressly said, in instances of medical devices, federal legislation preempts the state's ability to protect consumer safety, which has been a traditional thing that states can do normally. Your Honor, the Supreme Court expressed... Am I right about that? Do I have the facts right? Yes and no. Please tell me where I'm wrong. The Supreme Court's decision is explicitly predicated on implied preemption, not expressed preemption. That's interesting, and may be interesting, but the statute upon which they were actually dealing has an expressed preemption provision in it, right? It does, but Buckman had nothing to do... with the expressed preemption clause for medical devices. The issue there was, it was a state law claim for personal injury, which you can have state law claims for personal injury notwithstanding the expressed preemption clause. That's the Medtronic v. Lohr case. If the duty, which is in the case of a personal injury, the duty to use reasonable care in the production of a product. So there's a case where expressed preemption, the Medtronic case, did not bar... Let me just lay out for you what's bothering me. There are sections of the very statute that is at issue here, which have expressed preemption clauses, which we both agreed on. Medical devices is not the only one. And yet when it comes to drugs, which is the portion of the statute that we're trying to figure out whether or not this covers the product at issue, it expressly doesn't have a similar preemption clause. That's correct. My basic statutory interpretation class back in law school taught me that when one section of the statute says something, and the adjacent section of the statute doesn't, that I'm supposed to imply that if Congress knew and wanted to include preemption in the earlier one, it would have. Actually, the Supreme Court said in Buckman, as well as very recently in the Arizona case, that the existence or absence of an expressed preemption clause should play no role whatsoever in a court's analysis as to whether or not a state law claim is impliedly preempted. They are separate issues and courts are not to infer from the presence or absence of an expressed preemption clause that Congress did or did not intend to impliedly preempt a state law cause of action. So what the court said in Buckman is, look, we understand that states have certain historic policing rules. You can't sell defective or dangerous products. You can't lie or commit a fraud in the sale of your goods or merchandise. You guys just did. The fraud claim on the FDA in Buckman, that's not a traditional state police power. Exactly. Yes, but here, consumer safety is. So why doesn't this fall within the exception that the Supreme Court has acknowledged for causes of action brought on what are things the states are traditionally free to regulate? Okay, so that's the rub of the issue, Your Honor. I'm glad I finally got to it. Okay. Allergan admitted in the district court and does not contend otherwise here that its claim is not based on some inherent danger or lack of safety of Athena's product, nor is its claim predicated on state common law deception or misrepresentation. But to quote Allergan, it rises purely as a result of Athena's failure to obtain a new drug application, which is strictly an FDCA obligation. And they say, again, this is at pages 498 and 500 of the appendix, it's a case of pure statutory violation predicated on the absence of an approved new drug application. That is not a state law duty that predates or exists independently of the FDCA. It is strictly, it exists solely because of or by virtue of the FDCA, and that's why it's preempted. Now, Congress, would you agree that Congress gave authority to the states to enact even identical laws in this area? The identity test comes from... Did they give authority to the states to enact laws? No. There is no clause, the express preemption clause that Judge Moore was referring to in the medical device area, and there's one in the food area as well, says no state may enact any non-identical law. But those have nothing to do with the drug provisions. The drug aspects of the statute are silent as to what states may or may not do, except insofar as Section 337A of the statute says quite explicitly that any proceeding to enforce the requirements of the FDCA can only be brought in the name of the United States. No state can do that. The only exception in 337 is 337B, which is a limited exception for food, mislabeling allegations. Let's try it a little differently. Sure. If Congress has given them the authority to enact laws, even identical laws in this area, wouldn't they also have the right to have a remedy for those? If Congress had done that, I would agree with Your Honor, but Congress explicitly in 337 said back to the point that Judge Moore made a moment ago, that at least on the face of the statute, there's no express preemption, is there? We don't contend that there's express preemption, there's implied preemption. Which is a little hard to deal with when you've got express preemption right next door. In the medical device area. Yes. But there's no question, Your Honor, that there's implied preemption or can be in drug cases. There should be no distinction between the two. The issue is whether the provision of a state law claim or allowance of a state law claim would exert an extraneous pull on the enforcement scheme that Congress intended. And the enforcement scheme here for violations of the FDCA requirement to obtain a new drug application rests solely and exclusively on FDA's shoulders. The decision that FDA is charged to make is whether the products here, the cosmetic revital ash is also a drug under the provisions of the act, and that turns on a regulatory judgment call. The California Supreme Court, as you know, looked at this and the salmon cases, the farmed salmon cases. Yes, I'm quite familiar with it. Quite expressly that Congress gave authority for them to enact even identical laws. Right. Because they were looking at two pieces of statutory text that are absent here. The express preemption clause, which we discussed a moment ago, that says states may not enact anything that's not identical to the provisions of the FDCA as food is concerned. The California Supreme Court read that to say, well, that by negative implication, they can enact identical clauses and identical laws. And in addition, there's a second piece of text, which is a saving clause, which explicitly says anything not expressly preempted is preserved. That is not present in the drug area. Could you address just briefly the jurisdictional question in this case? Sure. The contention, which arose only after the court issued a request for additional briefing, was that because there had been a dismissal of the patent claims without prejudice, that divested this court of jurisdiction. The rule in this circuit, which was laid down by the court in 2004 in Chamberlain, is that a dismissal of patent claims divests jurisdiction only if the parties are left in the same legal position that they would have been by virtue of the dismissal had the patent claims never been brought. And we don't have that here. And with respect to two patents, the 029 and 404 patents, there are district court rulings that irrevocably and permanently affect the rights of the parties. Claim construction, and in one case, a covenant not to sue, which was the basis for a dismissal. From the standpoint of the court, though, that's kind of a private agreement between the parties, right? You've reached an agreement on claim construction. But the court, from its standpoint, there's no change in your legal obligations to each other, right? Well, clearly, as far as the court's concerned, one patent, the 029 patent, is out of the case by virtue of the covenant not to sue. And on that basis, it's granted a dismissal. But as far as the claim construction ruling, the motion that the parties made said that they'd reached a private agreement, and pursuant to that agreement, we'd like the court to dismiss the case, and the court granted that motion. And the court was fully informed. In fact, the court, as the record reflects, invited such a stipulation between the parties and then signed off on it. So there's no trying to pull a fast one on the district court here. Everybody knew exactly what was happening below. And those rulings will go back into effect if this court reverses. The Allergan says that it will refile its patent claims if the UCL judgment is reversed. I know you're about to tell me your time is up. No, no, don't worry. We'll take care of the time. We'll be fine. But I would like you to turn, in the event that you don't prevail in preemption, to your alternative argument about summary judgment and whether there existed a question of fact that should have precluded the award of summary judgment in this case. Sure. So this is actually, I think, the simpler of the issues, although it would warrant... Why the heck didn't you lead with it? I apologize, Your Honor, but I was trying to spare the client an unnecessary, and the court below, an unnecessary trial if the claim is preempted. But this is a heavily fact-based determination whether a particular product should be classified as a drug or a cosmetic. It's really a job for the FDA to do. But if anybody's going to do it, you have to start with the labeling and advertising for the product. And in this case, all of the labeling and advertising since 2007 has made cosmetic-only claims. This product will make your eyelashes look better, make them appear more beautiful, appear... In the red brief at 36, Allergan says that Athena continued to promote the product as both dermatologists and ophthalmologists reviewed and boasted that it had proven effective in only three weeks in a clinical study. Don't those necessarily imply a drug? Your Honor, the... A, is it true? Yeah. And B, doesn't that necessarily imply a drug? We don't dispute that there are some facts that support Allergan's argument. We contend that there are also facts that support Athena's argument, and that's why we need a trial. The law is quite clear that the most important information, the most important evidence for a court to consider is the labeling and advertising for the drug. These are classic cosmetic claims. They can nibble around the edges and say, well, you know, one of your unauthorized resellers said something that's consistent with a drug claim, or you still have some reference to a clinical study. And the FDA, if the FDA were doing its job, would weigh all of that. And by all apparent indications, the FDA did that back in 2007 and continued to look at this category of eyelash conditioners for years thereafter, and has taken no action against Athena, which we contend gives rise to a very strong inference that the FDA views the product as a cosmetic, not a drug, which is a factor that the court... ...would automatically then be subject to FDA requirements. Doesn't FDA review cosmetics as well? Well, no, they don't. So if someone wants to sell a cosmetic, it doesn't need to go to the FDA and seek any pre-approval or pre-clearance. It just goes ahead and does it. And the FDA's only way of indicating its approval is through silence, which is effectively what has happened here, but... You have a chemical that grows eyelashes, right? I mean, is that... It has that property. Okay, yeah. So you've got a chemical that grows eyelashes. That just feels an awful lot like a drug to me. Yeah, I grant you, Your Honor, it is counterintuitive. The legal standard is counterintuitive. Let me give you another example. Sure. Rogaine. Guess what? FDA drug. How is it different, right? Rogaine grows hair. This thing grows eyelashes. Sure, because of the way... Both cosmetic, but yet both drugs. You'll have beautiful lashes sprouting out from the top of your head. You can pour some mouthpiece or, you know, misterial, I think. No, Your Honor, you're absolutely right. To a stranger, this is not an intuitively obvious point, but take mouthwash, for example. You can take the exact same ingredients, these essential oils, put them in scope mouthwash, and it's marketed to fresh in breath. That's a cosmetic claim. FDA regulates that as a cosmetic. Take the exact same stuff, put it in a different bottle, call it Listerine Antiseptic Mouthwash. Kills bacteria, prevents gingivitis, removes plaque. That's a drug. And there are countless examples of this. So the fact that a particular skin moisturizer, if it's marketed... They don't care whether it is a drug, the FDA. They only care whether you tell people it's a drug. The FDA defines drug and cosmetic by each product's intended use and determines intended use by the claims that are advanced for the product in the marketplace, not what it actually does. Recognizing that there are substances that can meet both definitions at the same time, and the product gets classified based upon the claims that are advanced for it. I'd say... You can't appoint the claims that your clients may cry drug. We will concede, Your Honor, that the claims with which the product was launched in 2007 probably went over the line. There were efforts to stay on the right side of the line, but the advice wasn't great, and they probably went over the line. The regulators stepped in. Both the California state regulators and the FDA stepped in. And Athena, through counsel, submitted detailed revision, revised action plans, how it was going to bring its advertising into compliance with FDCA requirements, changed all of its labeling, required its authorized resellers to refrain from any drug or hair growth or eyelash growth claims, did many things to bring its product into compliance with these regulations, and the regulators backed off. But Allergan did not, and that's why we're here. One last factual question. As a lady judge, I was impressed with the whole technology, but is it true that eyelashes fall out if you stop using the product? And so, like, you have, you know, like, like the hair at the bottom of the drain sort of thing? I honestly don't know. My wife is concerned that the product is alleged to have a side effect to turn brown eyes blue, which, excuse me, blue eyes brown. The other way around would be great, which is enough. What? You just insulted the female judge with brown eyes, my friend. Show your audience before you say anything. This is why Brooke Shields is now the spokesperson instead of Claire Dane for Latisse. I'm way past my time. Thank you, Mr. Zaleson. Would you give Mr. Perry an extra six minutes if he needs to use it? I'd be only too happy to. You may proceed, Mr. Perry. Chief Judge Rader, may it please the court. Judge Moore, you asked about the express versus implied. In the Supreme Court's quintet of preemption cases under the FDCA, two have involved prescription drugs, neither of which my friend mentioned, WIA and PLEVA. And WIA, at page 574 of the Supreme Court's opinion, speaks directly to your question, Your Honor, earlier. Quote, if Congress thought state lawsuits posed an obstacle to its objectives, it surely would have enacted an express preemption provision at some point during the FDCA's 70-year history. But despite its enactment of an express preemption provision in the MDA, which we were talking about earlier, Congress has not done so for prescription drugs. And then the conclusion the court draws from that on the next page, its silence on this issue, coupled with its certain awareness of the prevalence of state court litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness. Which then brings us to what's left. We have WIA, which held that those claims were not preempted, and PLEVA, which held that those claims were preempted. I don't want to derail you, Mr. Perry, but you argued in supplemental briefing to us that our court didn't have jurisdiction over this case. Do you continue to believe that that's the case? We do, Your Honor. After we looked at it when the court issued its order, let me address the two patents. What about the... no, no, sir, I think you're mistaken. There aren't two patents in this case. Look at the complaint. How many patents are in this case? Originally, Your Honor, there were... In the amended complaint, how many patents? Four, Your Honor. Right, okay. And what happened to the 105 patent? There was summary judgment granted of non-infringement. I'll help you out. Is that adjudication on the merits, Mr. Perry? Yes, Your Honor. Does res judicata attach to a summary judgment of non-infringement? Certainly, Your Honor, but... Is that not dispositive of our jurisdiction? We have... I realize we asked you to brief it, but I was kind of hoping you would have really briefed it with all the facts. Well, we would brief it with all the facts that are adverse to our client. We haven't appealed from that and don't intend to. We have... As to the parties before you, you don't have any patent claims being asserted in this court. Wait, is that the test for our jurisdiction? That is the test under Grunholz, yes, Your Honor. Wait, you think the test for our jurisdiction is do there continue to be patent claims asserted at the appellate level as opposed to the well-pledged complaint rule of Christensen versus Culver? Christensen plus Grunholz means that a dismissal without prejudice of the remaining patent claim... The summary judgment, was that a dismissal without prejudice? No, Your Honor. No, so there was an adjudication on the merits which res judicata attaches in this case. Do you still contend that we do not have jurisdiction? Let me just throw in something I'm interested in on that same question, and that is in that paragraph of that order, in the last paragraph of that order, it says that this order is entirely contingent upon the preservation of plaintiff's right to appeal this order. Yes, Your Honor. I mean, I think that answers it. We'll move on to the merits of the court, the court's jurisdiction. Thank you, Your Honor. On the preemption question, assuming this court will decide it. One further question, why didn't we hear about this sooner? Your Honor, I will look into that and respond back if I may. This is my mistake. Please proceed. Thank you, Your Honor. On the preemption question, we have Wyeth and Fleva in the prescription drug context where we have no express preemption. We have only the implied preemption. We have the test that the Supreme Court has announced in those cases is whether the state law claim is independent of the FDA, and that comes from Buckman through Wyeth to Fleva. And in Fleva, the court was very clear in announcing precisely what it means to be independent for preemption purposes under the prescription drug part of the FDCA. And I should add parenthetically, Judge Moore, on your earlier question regarding the structure of the statute, the Wyeth court also pointed out that the savings clauses that Congress has included in the prescription drug amendment, Section 202 to the 1962 amendments and Section 379R, which goes to non-prescription drugs, over-the-counter drugs, evidences Congress's understanding that parallel state regulations, and Chief Judge Rado, this goes to one of your questions to my friend, that parallel state regulations would be permitted to proceed, and that was a holding of the Wyeth court, as presaged, of course, by Medtronic v. Lohr, which specifically used that word, parallel state proceedings. It borrowed it from the Bates case, which was a FIFRA case, which involved an unfair trade practices claim, very like the California unfair competition law claim in this case. So that was sort of the genesis of that. To return then to Fleva and what the test is for preemption here, after Buckman, and this is another quote, page 2581 of the Supreme Court's opinion, when a party cannot satisfy its state duties without the federal government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for preemption purposes. Or, to put it another way, the way the California, or excuse me, the Ninth Circuit did in Perez, is the claim dependent on FDA. Or to put it the way the Supreme Court did at the very end of Buckman, page 535 at the last page, do the claims depend exclusively on FDA or the FDCA? What do we make of the fact that the FDA did not itself choose to move forward and investigate or regulate? How many times did you ask them to? Well, Your Honor, we have asked them a number, and they have regulated and investigated a number of these complaints. There's two answers to that. First, the agency has a certain limited jurisdiction, and under Heckler v. Cheney, the court can't draw any inference from agency inaction in the prosecutorial space. Second, and I think more importantly, actually, this judgment, very well publicized, very well known to FDA, has been on the books for a long time now. We've heard no displeasure from FDA that it disagrees with the finding or with the proceedings as a matter of state law. In other words, there's been no suggestion from FDA that it disagrees. Well, has it suggested that it's going to now investigate and hold them to a standard by which they have to pass the new drug application and everything? Has it chosen to enforce the FDA statute? It hasn't done anything, Your Honor, and it doesn't need to now. Of course, there's a state law judgment against this. When you say it doesn't need to, surely it does, right? The FDA is not free to rely on state enforcement. If the FDA believes that there is a violation of federal statute, aren't they obligated to investigate and enforce the federal statute? Certainly they may, Your Honor, but the injunction in this case precludes the sale of these products. So there's not, you know, in the FDA's hierarchy... How can a California court do that? How can a California court, based on California state unfair competition law, preclude the sale of products beyond the boundaries of California? Your Honor, the question under California law, and this is a California state claim, is whether the effects of the conduct are felt in California by a California resident, they can complain about them. This is the unfair competition law. It's an unfair trade practices statute. If the injunction prevented sales, and there was a sale within interstate commerce, but not in California, would the court take action to enforce the injunction in that circumstance? Well, Your Honor, the Athena would be in violation of the injunction, and if that came to our attention, certainly we could move for contempt sanctions against them for violating the injunction. And there's a reason that this came about. This was not out of the blue, and Judge Moore, to go to your question specifically, how can a court do this? We had in this case a real-world test of the effectiveness of a more limited injunction. Athena voluntarily said, we will stop selling these products in California when it became clear after the summary judgment ruling that they had a drug. They supposedly changed their website and so forth. We went out and proved, and there's an extensive affidavit with hundreds of exhibits in the record that's cited in our brief that showed that people were able to continue purchasing the product in California, and every sale in California harms Allergan. And the district judge made a specific finding in the record that there was no practical way to stop the harm in California without enjoining Athena outside of other sales because of Athena's own inability to do it. In other words, this wasn't a guess by the district judge. Athena had the opportunity to show that it had ability to comply with a more limited injunction, and it totally failed. And there's an extensive factual record on this, and they put in nothing in opposition. And as I said, the district judge, Judge Selna, made factual findings on this that, and every sale, by the way, this is a very limited market. Lattice is the only approved product to grow eyelashes. Every product they sell takes a sale away from Lattice. And you can't, there's no one else they're competing with other than the other snake oil dealers, okay? Well, I don't know if that's right because their product is sold at a much lower cost than yours. And so I don't think it's actually quite economically correct for you to argue that every lost sale or every sale of theirs is lost to you because a lot of those people wouldn't pay the much higher price or go to the doctor and get the prescription. But nonetheless- It's about a 30% premium, Your Honor. Their product is still very, you know, it's $100 or so for a two milliliter bottle. They're competing at the same- But you've got to go to the doctor and get a prescription for yours. You know, I mean, there's a lot more involved. You can't possibly allege a one-to-one lost sale. But we have a finding of direct competition, certainly, because they're in the same market and their eyelash growth products is a very limited and specific market that you can't go out and replace someplace else. Return to the question about the FDA's enforcement priorities. You know, now that the injunction is in place, the FDA, you know, right now the FDA isn't doing anything. The government has an issue. And I'd like to turn to that point, really goes back to the preemption point. Because the other aspect of this test, and Chief Judge Radovich goes to your question, whether states can adopt parallel or identical state laws. While that does have a tinge of expressed preemption, the Regal and Lore cases both made clear that that's an appropriate inquiry for implied preemption as well. And that, again, comes from Bates. And there, it is very clear that this claim is parallel, identical to the FDA requirements, California's description of a drug is word for word identical to the federal statutes. But it is independent. And my friend, Mr. Zalesan, said earlier that our claim was, quote, strictly an FDA violation with respect to the new drug application. And it's there that we disagree. It is there that we disagree on the facts and on the law. And I would like to point the court to California Health and Safety Code, Section 11550, which is the statute that the district court found to have been violated by Athena Zales. And that prohibits the introduction of a new drug into commerce. And we can talk, if you'd like, about why this is a new drug. But I think the earlier questions made that pretty clear. Without obtaining either, and that's in the statute, either of two things. And then it has Subsection A, a Section 505 NDA approval from FDA, or Subsection B, a regulatory approval from the California Department of Health Services. So that the Athena can satisfy this state law without ever talking to FDA, without ever sending a letter to FDA, without ever going to Washington. If FDA stays shut down, they still are violating this law because California is not shut down and they have not gone to the California Department of Health Services under 11550B, as would be required. Could you turn to whether or not this is a drug? Because that's the most difficult issue in the case for me, quite frankly. The summary judgment on a factual question like this, when there is some competing evidence to the contrary in this case, makes it a little bit harder. So tell me why we should not reverse the grant of summary judgment. Certainly, Your Honor. Start with, it is a question of objective intent, which under Matsushita is susceptible to summary judgment, okay? So there's no legal barrier if the evidence will show it. But it's still a fact question. It is ultimately a question of fact, and here the facts were absolutely undisputed. I mean, let's start with the labeling. The first product they put on the market, what did the label say? Formula Lash Grow. Why is that relevant? You're going to start to cite to us a good many facts which go in your favor. And then we heard Mr. Zaleson tell us, well, there are facts that go the other way. How do you deal with Judge Moore's question that this is summary judgment and we shouldn't be resolving those fact questions in this manner? Your Honor, I've read the briefs very carefully, obviously, at the court, and I listened very carefully to Mr. Zaleson's argument. What he said, the facts that went other way is that the current label, you notice he admitted that the past label was an illegal drug. Now, first on the website and other advertising, they have never disavowed any of the past claims. So it started out as an unlawful drug that has never been disavowed or disclaimed. In fact, every new iteration of this product as they stay one step ahead of the sheriff says it works better than the last one. So they're building on this installed base of a new drug. But then what did Mr. Zaleson actually say was the disputed facts? He said the current labeling makes eyelashes, quote, look and, quote, appear better. That was the only thing he said today in the court as being conflicting evidence. And it is certainly true, Your Honor, that the current labeling says that, but the court doesn't have to ignore the world. How is it that a clear liquid applied by drops to the skin at night makes lashes look or appear longer and thicker? The answer to that, as the district court found, as Mr. Zaleson just admitted, as the inventor admitted, is because it actually makes them grow. It contains a prostaglandin analog recognized by everyone in the field to cause hair growth. And it is sold as that. So that when- Let me just set the time out for a sec because I agree with you. It's a drug. I mean, it causes the eyelashes to grow, but that's not the test, which caused me a lot of pause as I was trying to learn in preparation for this case. The test is objective intent. It seems to be what they intend to sell it as. Are they intending to sell it as a cosmetic? Are they intending to sell it as a drug? The question, unfortunately, at the bottom of the inquiry isn't, what is it? Is it a cosmetic or is it a drug? And that's the part I found a bit confusing and difficult to wrap my hands around, is that I'm not supposed to focus on what the product truly is, but rather how they're selling it and marketing it. Give two answers to that. First, the court can't ignore what the product is. If I put cocaine in a tin and call it face powder, it's still cocaine, okay? It is still a drug and the absolute physical properties cannot be ignored. Second, they don't have to intend to sell it as a drug. Look at the statute. What it says is- Doesn't the use here dictate whether it's a drug or cosmetic? Your Honor, consumer use- And if it's used in both ways, which is it? Your Honor, it can be both. But if it's a drug, it is regulable. And therefore, if consumers use it as a drug, that is, put it on their eyes at night as instructed so that it grows their hair, it's a drug. And to answer your question, Judge Moore, the intent is not whether it's a drug, but whether it is intended to affect the structure or function of the body. That's a functional test, not a labels test. They intend people to use this to make their eyelashes appear, as Mr. Zalesan said, longer and thicker, because they will be longer and thicker. They intend people to put these little drops of clear liquid on their eyelashes before they go to bed so that after three weeks, they start to grow. And if you stop using these products, they will shrink and become smaller and start to fall out. They intend that use. They want to sell you- Look at the website. They sell it to you in these two milliliter vials that are good for a three-month supply. You don't buy mascara, with all due respect, Your Honor, in a three-month supply. You buy drugs in a three-month supply. And the intent conveyed in the labeling, from the formula lash grow, and then we've got all of this external evidence. They sell it through this network of 11,000 internet resellers. And they've got testimonials on these websites about daddy long legs lashes, my lashes grew out to hit my eyelashes, all of which is conveying to the consumer base precisely what this seller intends, which is what this product does, which is make your lashes grow. And they're selling it as the alternative to Latisse. Everybody knows what Latisse does because it's marketed for exactly one thing, to make your lashes grow. And they are marketing this product as the non-prescription alternative to Latisse. The only inference- I have a dumb, a really dumb question. I just don't know this area of the law very well. But cosmetics aren't claims in California state court under unfair competition, preempted for cosmetics. They might not be for drugs, but aren't they- isn't it established that they're preempted for cosmetics? There's an express preemption provision that applies to some cosmetic claims. Yes, Your Honor. The only reason I ask is because a minute ago you said this could well be cosmetic, but it's also a drug. And it seems to me that if my recollection is correct, that the FDA preempts state law claims involving cosmetics, then you'd be back in a circle on your preemption problem. And I don't think you want to go there, do you? The circle is broken in this sense. The same product may be both a drug and a cosmetic, but if it's a drug, that's the higher level of scrutiny that kicks in under California law and under federal law, but more importantly for this case, under California law, if it's a drug, then the California Department of Health and Safety requirements kick in. So that if it's simultaneously, it's not circular at all. If it's a drug, whether or not it's a cosmetic, it has to be regulated, it has to be approved as a drug. What I find persuasive in your oral argument and what bothered me in the record was I don't see anything that says, put this stuff on in the morning and your lashes will appear longer and fuller. Obviously your opposing counsel have a chance to address this, but am I correct that there's nothing that this application is at night? The instructions for the product direct the consumer to apply it at night before bedtime. And interestingly, the active ingredient in this product, they have filed a patent application with the, it's usually down the hall, but we're in a different city today. The patent application says that this product applied at night by drops will cause hair to grow. So there's no question about what their intent is for the product to do. And again, it's a clear liquid. It's not a mascara type product. It's not a darkening product. It's not a thickening product. It's a medium for getting a prostaglandin analog into your hair follicles so that the chemical operation of that molecule will actually cause your hair to grow. That is a drug. That is a drug under federal law. That is also a drug under California law. And under California law, they were required to get a new drug application approved either by FDA or by CDHS. They didn't do either. The UCL and the farm-raised salmon case that Chief Judge Rader raised says that that is actionable under California law. And if the states may enforce their own law- Can I ask a dumb question? Things like Estee Lauder serum, which has alpha hydroxy acid in four weeks is guaranteed to give you younger looking skin. Drug or cosmetic? Do you know? I don't on that product. What do you think it is? I don't know. Because I mean, I researched Rogaine, but I didn't research other things. Rogaine. Rogaine seemed like the most natural analog. Rogaine is better. Because there are clinical trials showing that it affects the structure of the body. Your Honor, in my last zero seconds, I would like to point out, rather than bombard the court with another 28-J letter. Yesterday, the Supreme Court asked the Solicitor General to file a brief in the Medtronic versus Stengel case, which Athena cites in its brief, which raises, among other things, a question of implied preemption under Section 337. If the court has any- We put in the government's brief from last time around. My friend said, you know, that's not entitled to deference. The court may still, if it's interested, have the government's current views on its MDA preemption, not prescription drug preemption. But I want to let the court know of that development that just happened yesterday. Thank you, Mr. Perry. Mr. Zaleson will restore two minutes of rebuttal time. Thank you, Your Honor. I'll start right where Mr. Perry did, which is with the Wyeth case. The reason why Wyeth was not preempted is because it was a traditional state law claim for failure to warn- You know, I think we understand preemption law pretty well, but I really- The record here is a little more difficult for me. Will you tell me what your very best facts are that you think create a genuine issue that should have precluded summary judgment? Sure. Start with the labeling and advertising, which since 2007 has consistently and unwaveringly made only cosmetic claims that will help the look and appearance of eyelashes. Are the past labels irrelevant to the inquiry? They have, if anything, only the most tangential relevance. There was an allegation- Does the current label talk about lengthening? It does not, Your Honor. It does not use any words like grow or lengthen. It says, well, give your eyelashes the appearance or look of being fuller or thicker, just like mascara. The exact same claims you would find on mascara. It's okay to put it on in the morning then. Your Honor, with respect to that point, Judge Moore referred to these anti-wrinkle creams, moisturizers. They're used at night also to help your skin be moist and not look dried out. Well, there's a difference, isn't there? Isn't a cosmetic designed to alter appearance? Not necessarily. You're thinking of something like makeup or mascara, but in the mouthwash example, the reason why- Is mouthwash a cosmetic? Yes. Scope mouthwash freshens breath. That's a cosmetic. Eliminates the odor of bad breath. The reason it does it, it kills bacteria. That's a drug. If they said kills bacteria that causes gingivitis, which Listerine does for the exact same set of ingredients, they'd be selling a drug. Same with skin moisturizers. If you say it'll prevent anti-aging or anti-wrinkle, FDA considers that a drug. If you say it leaves your skin feeling moist and supple and looking that way, it's a cosmetic, whether you put it on at night or in the morning or in the middle of the day. What about the injunction? You argue the injunction is overly broad and expands beyond the California court's ability to regulate conduct, but we give a lot of discretion to injunctive remedies and the crafting of them. In particular, we have to find an abusive discretion to overturn it. So why is it an abusive discretion when, as Mr. Perry suggested, you had every opportunity to show you were capable of limiting the damage to California consumers and weren't able to do so? Well, two points. First, it's always an abusive discretion if it's contrary to law. And here, the California Supreme Court in Sullivan said that the UCL California consumer protection laws have no extraterritorial application. So by law, they cannot support, those laws cannot support an injunction outside California. With respect to the question about the ability to control the flow of the product into California, Mr. Perry is right. Athena made a voluntary undertaking after the summary judgment ruling came down. There was a hotly disputed issue in the district court as to whether they were living up to that undertaking or not. The district court made no finding on that issue. It didn't resolve anything. It simply made a one-sentence assertion that it would be easy to evade the injunction unless it prohibited sale in Maine and Puerto Rico and Florida and New York. It would be easy to evade the injunction against sale in California. There's no support for that. There's no finding that supports that and it's improper. If I can make just one other point, Mr. Perry argued that California has a separate machinery or regulatory mechanism for submitting an application for new drug approval. And so this idea that our claim arises under or exists solely by virtue of the FDCA is wrong. The evidence in this case is undisputed. It's at page 2208 of the record that California has never approved a new drug application. It has no ability to do so. It has no department that does that. Every single drug that's ever been sold in the state of California has been sold there by virtue of FDA approval.  that's contradicted by the record. Thank you, Mr. Stiles, Your Honor.